## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA      :
     :
            v.             :      Criminal Docket No.
     :      3:04 CR 316 (CFD)
VICTOR MADERA      :

## RULING ON DEFENDANT'S MOTION TO SUPPRESS

Victor Madera has been charged by a grand jury indictment with one count of possession of ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  The indictment alleges that Madera, who has previous criminal convictions on Connecticut state charges of escape in the first degree and sales of narcotics, was arrested by Hartford city police officers on August 13, 2004.  At that time, the arresting officer claimed that he found Madera in possession of a Colt revolver loaded with hollow-point bullets.

By motion dated December 15, 2004, Madera moved to suppress the firearm seized from him during his August 2004 arrest, as the product of an unreasonable search and seizure in violation of his Fourth Amendment rights.  The Government argues that the revolver was discovered in the course of a search incident to a lawful arrest or, alternatively, was the product of a constitutional "stop and frisk" supported by reasonable suspicion.  See Terry v. Ohio, 392 U.S. 1 (1968).

The court held a two-day evidentiary hearing on the motion on May 19, 2005 and June 2, 2005.  Following are the Court's findings of fact and conclusions of law.

1

I.      **Findings of Fact**

Victor Madera was arrested on August 13, 2004 at the "Windsor on Main" housing

development, located at 2602-2620 Main Street in Hartford, Connecticut.[1]  Hartford Police

Officer Louis Poma testified that the 2602-2620 complex, which consists of several privately

owned multi-unit apartment buildings, commonly is referred to as "New Jack City" due to the

drug and gang activity associated with the location.[2]  Windsor on Main was owned by Vesta

Management Company, which employed Kelly Giampa as its on-site property manager for the

buildings.   Giampa first contacted Officer Poma on April 22, 2004, stating that the development

suffered from "individuals continuously loitering, gambling, soliciting, selling and using illegal

drugs while blocking pedestrian traffic, and causing loud noise disturbances," affecting the

quality of life for property residents.[3]  According to the Hartford Police Department's report,

Giampa wished to have "any criminal or civil violations enforced and all violators arrested or

cited for such violations" and she filed a standing police complaint to that effect.[4]

---

[1] Specifically, Madera was arrested in the parking lot of 2604 Main Street, one of the constituent buildings in that complex.

[2] The film New Jack City (Warner Bros. 1991) concerned a New York drug dealer who eventually takes over an inner-city apartment complex and becomes the kingpin of a crack cocaine-distributing street gang.

[3] Officer Poma was assigned to the Hartford Police Department's "North Community Response Division," which was responsible for monitoring public drinking, narcotics sales, and other "quality of life" issues in the northern quadrant of the city.  His duties included taking a "proactive" approach to these problems.

[4] The parties dispute as to which property Giampa's complaint applied.  The defendant produced a police report and attached "standing complaint" from Giampa, dated April 22, 2004 and assigned Hartford Police Department case number 04-19555.  That police report refers to the "Windsor on Main Apartments", but gives various addresses of 2505 and 2620 Main Street. Giampa's standing complaint refers to the Windsor on Main Apartments, and also sets forth addresses of 2505 Main and 2620 Main Street.  The Government produced another police report

On August 11, 2004, Ms. Giampa again called Officer Poma, this time to report numerous complaints of drug dealing taking place in the 2604 Main Street parking lot. Giampa had been told by residents that the drug dealer was Efrain Rodriguez, whom she described as a Hispanic male, approximately 5 feet 8 inches tall and weighing around 180 pounds, with a "corn roll" [sic] hairstyle. Giampa informed Poma that while Efrain Rodriguez often resided at 2604 Main Street, Apartment 1, his name was not on the lease agreement and that he therefore should be considered in violation of the standing order.

Poma drove by 2604 Main Street on the evenings of August 11 and 12, 2004, but did not see anyone matching Rodriguez's description. Officer Poma returned to 2604 Main Street shortly after 8:00 P.M. on August 13, this time accompanied by patrol officers Richard "Kevin" Salkeld, Danny Villegas, and Sean St. John. As the officers pulled into the parking lot, they observed a group of males standing or sitting by the side steps of 2604 Main Street, listening to

_____

and attached standing complaint from Giampa, also dated April 22, 2004 and assigned Hartford Police Department case number 04-19556. Report number 04-19556 refers on its face to the Windsor on Main Apartments, but lists the address as 2620 Main Street. The attached standing complaint of Giampa sets forth the address first as 2602 and later as 2620 Main. (It was established at the Court's hearing in this matter that 2602 Main Street is physically the same building as 2604 Main Street, the two sides of the building being issued different address numbers.)

In the incident report describing Madera's arrest, Hartford police officer Louis Poma refers to the standing order filed under case number 04-19555. See Defendant's Exhibit A. The Government submits that the incident report contained a typographical error, and that Officer Poma intended to correctly refer to case number 04-19556. The defendant does not dispute the existence of standing order 04-19556, but rather contends that standing order 04-19555 did not provide a valid basis to investigate the 2602-2620/"New Jack City" complex, as that order refers to a different property. (That the Hartford Police Department had similar orders on record is consistent with Giampa's testimony that she first filed a standing complaint with the police for "a different property, but [then] I decided to do it city-wide to make it one standard for all my properties.") In any case, the Court concludes that the presence of standing order 04-19556 and Giampa's expressed willingness to enforce quality of life violations at the entire Windsor on Main complex provided the Hartford Police Department a sufficient basis to monitor the 2602-2620 property (including 2604 Main Street) for such violations.

loud music.  The men were drinking alcohol.[5]

Officer Poma went toward the man who most closely matched the description of Efrain Rodriguez, while Officers Salkeld and St. John approached Rufus Howell and Madera.[6]  As the officers pulled into the 2604 Main Street parking lot, Victor Madera was standing next to Rodriguez.  When the officers approached Rodriguez, Madera, and Howell, Madera appeared to "get nervous" and "fidgety."  Madera kept placing his hands in and out of his pockets and "looking around  . . . looking for an avenue of escape."  As Salkeld observed Madera's hands continually moving toward his waist, he then noticed a bulge under Madera's untucked shirt and near his waistband.  Salkeld decided at that moment, and independently of Officer Poma (who was busy interviewing Rodriguez), to conduct a patdown of Madera for reasons of officer safety.

Salkeld called Madera over, told him to keep his hands out of his pockets and visible, and walked him over to Rodriguez's car to conduct the search.  During the walk, Salkeld claimed to observe Madera's rapid heartbeat moving his shirt.[7]  Upon reaching the car, Salkeld ordered Madera to place his hands against the car (with which request Madera complied) and asked him

---

[5] Efrain Rodriguez, Rufus Howell, and Victor Madera were members of this group.

[6] Officers Poma and St. John were in standard police uniform, while Salkeld and Villegas wore police jerseys displaying their badges.

[7] Madera disputes this claim, in part alleging that it was too dark by approximately 8:30 p.m. for Salkeld to make such a close observation.  In support of his argument, Madera has submitted documentation from the United States Naval Observatory indicating that sunset in Hartford County occurred at 7:53 p.m. on August 13, 2004.  The Court does judicially notice the time of sunset, pursuant to Fed. R. Evid. 201, but further notes that no evidence was introduced as to the precise degree of relative darkness at 2604 Main Street on that night, nor as to what streetlamps or other lighting illuminated the scene.  Detective Salkeld testified that at the time of his search, it was "getting dark" but that he was close enough to Madera to make precise observations.  Regardless of whether Salkeld truly was able to observe Madera's heartbeat, the Court finds that the police had enough other specific observations to support a <u>Terry</u> stop.

4

if he was carrying any weapons.  Madera told Salkeld he was carrying a gun; Salkeld then

removed a Colt .38 caliber revolver from the same area along Madera's waistband where he had

first noticed the suspicious bulge.  The revolver was loaded with six Winchester .38 caliber

hollow-point bullets.

Madera was arrested and charged with carrying a pistol without a permit, in violation of

Conn. Gen. Stat. § 29-35; criminal possession of a pistol by a felon, in violation of Conn. Gen.

Stat.  § 53a-217c; and public drinking from an open container, in violation of Hartford City

Ordinance 4-3.[8]  Madera was then taken to the Hartford police headquarters, where he was

informed of his Miranda rights.  He waived those rights in writing, after which Hartford detective

Dennis Sikoski interviewed him.   Madera told Sikoski he had been drinking alcohol when the

police arrived and that he had purchased the revolver two years before.

## II.    Conclusions of Law

As a general rule, a criminal defendant who seeks to suppress evidence bears the burden

of proof.  See United States v. Galante, 547 F.2d 733, 738 (2d Cir. 1976), cert. denied, 431 U.S.

969 (1977).  A defendant seeking to suppress evidence based on a search or seizure must first

establish standing, i.e., an expectation of privacy, by a preponderance of the evidence. See U.S.

v. Osorio, 949 F.2d 38, 40 (2d Cir. 1991).  One has a reasonable expectation of privacy in one's

body, a search of which constitutes "a serious intrusion upon the sanctity of the person."  Terry v.

Ohio, 392 U.S. 1, 17 (1968).

Having satisfied the standing requirement, the defendant next must establish a basis for

---

[8] Madera's state charges remain pending.  The searches of Efrain Rodriguez and Rufus
Howell found nothing.  Both men were released from the scene, though Rodriguez was cited for
violating a municipal noise ordinance due to the loud music emanating from his car.

his motion to suppress, such as an initial showing that the search was conducted without a

warrant.  The burden of proof then shifts to the Government to show that the warrantless search

falls within one of the recognized exceptions to the warrant requirement.  See United States v.

Sacco, 563 F.2d 552, 558 (2d Cir. 1977), cert. denied, 434 U.S. 1039 (1977).  Madera has

standing to bring this motion to suppress, and the search in question was a warrantless one.  The

Court concludes, however, that the Government has met its burden that there was sufficient basis

to conduct a warrantless stop and search of Madera under the principles of Terry v. Ohio, 392

U.S. 1 (1968).[9]

_____

[9] Madera argues that his search was unconstitutional for a different reason: because it was
predicated upon his arrest for violation of the city ordinance prohibiting public drinking.  First,
Madera claims that he committed no offense and was not drinking in the presence of police on
the night of August 13, 2004.  Second, he contends that the parking lot of 2604 Main Street is a
private space limited to residents and their guests; therefore, even if Madera had been drinking,
he committed no public infraction.  On this reasoning, the police had no grounds to search or
arrest Madera, and the seized weapon must be suppressed under the "fruit of the poisonous tree"
doctrine of Wong Sun v. United States, 371 U.S. 471 (1963).
        The Hartford city ordinance under which Madera was charged prohibits the consumption
of alcohol or the possession of any open container of alcohol "upon or within the limits of any
public highway, public area, or parking area within the city."  Hartford, Conn., Municipal Code §
4-3(b) (2005).  Parking areas are defined as "lots, areas or other accommodations for the parking
of motor vehicles off the street or highway and open to public use, with or without charge."  Id.
at § 4-3(a).  Persons found to be violating the ordinance are to be summoned to community court,
where the potential penalties include community service, fines, or a jail sentence of up to 25
days.  Id. at § 4-3(d).
        At the Court's evidentiary hearing, Madera presented evidence that the lot should be
considered a private one, as it was intended only for parking by residents of 2602-2620 Main
Street and that restriction was enforced by the use of resident parking stickers and towing of
unstickered vehicles.  As the 2604 Main Street parking lot was not truly open to public use,
Madera argues, it should be considered private living space and drinking therein should not
constitute a violation of Municipal Ordinance 4-3.  The Government, however, presented
conflicting evidence suggesting that the 2604 Main Street lot was open to public use.  The
parking lot is not gated and has no other physical barrier preventing vehicular or pedestrian
access.  Although parking officially is limited to residents, there is no sign posted at the 2604 lot
announcing that restriction.  Additionally, immediately south of the 2604 Main Street parking
area are several neighborhood retail establishments, including a barber shop and convenience
store; pedestrians apparently use the parking lot as a gathering place and a "cut-through" path to

Terry v. Ohio, 392 U.S. 1 (1968), allows police officers to conduct warrantless search and seizures under limited circumstances.  A constitutionally permissible "Terry stop" requires that the searching police officer "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. at 21. The Terry court specifically held that

> there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.

Id. at 27.

A court evaluates whether a Terry stop was supported by reasonable suspicion based on the totality of the circumstances, as seen "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." United States v. Colon, 250 F.3d 130, 134 (2d Cir. 2001) (quoting United States v. Oates, 560 F.2d 45, 61 (2d Cir. 1977)).  This Court finds that the totality of the circumstances, as witnessed by Detective Salkeld, justified Madera being stopped and frisked for weapons: the officers were present in a reputed high-crime neighborhood, following up on a credible and specific complaint of drug dealing; Madera was seen conversing with and in close proximity to the alleged drug dealer; upon being approached by the police, Madera appeared extraordinarily nervous and as if he were about to flee the scene; Madera kept moving his hands to and from his waistband, where Salkeld observed a bulge

---

the nearby stores.

As there is a sufficient alternative basis on which to uphold the search, the Court declines to resolve the issue of whether the parking lot should be considered public or private, and the concomitant issue of whether Madera lawfully was searched incident to his summons under Municipal Code § 4-3.

consistent with a concealed weapon; and the violent nature of the drug trade and its association with firearms is well-known to the experienced police officer.  Under these circumstances, Detective Salkeld acted reasonably in stopping and patting down Madera.[10]  See also United States v. Barlin, 686 F.2d 81, 87 (2d Cir. 1982) (upholding investigatory stop and seizure of a woman who, while unknown to the searching agents, "was not innocuously present in a crowd at a public place" but rather entered "in tandem . . . [with individuals] whose involvement in an ongoing narcotics transaction seemed apparent.").  As Madera's search and subsequent arrest were legal, there is likewise no reason to suppress Madera's post-arrest and post-Miranda statements to the police.

---

[10] Madera argues that Officer Poma's observations recorded in his police report differ from those of Detective Salkeld, undercutting the validity of his search.  Notably, Poma's report implies that Madera was handcuffed and searched based on his violation of Municipal Ordinance § 4-3, and that the Madera's suspicious bulge was noticed as he was being searched, not prior.  However, at the Court's hearing, both Poma and Salkeld agreed that Salkeld was the officer directly responsible for observing and speaking to Madera and that the bulge was directly observed by Salkeld, not Poma.  Salkeld additionally testified that he had neither reviewed nor signed Officer Poma's report at the time and that his decision to conduct the patdown had nothing to do with Madera's receipt of a municipal summons.  The Court concludes that, because it was Detective Salkeld who actually searched Madera, it is his observations which are controlling and which are more likely to be accurate as to this specific defendant.  For the reasons previously discussed, the Court credits Detective Salkeld's testimony and finds that it supports the constitutionality of the search at issue.

**III.    Conclusion**

The Court finds that the search of Victor Madera and the seizure of his firearm and ammunition did not violate Madera's Fourth Amendment rights.  Therefore, the Defendant's Motion to Suppress [Doc. #12] is DENIED.

So ordered this __9th__ day of February 2006 at Hartford, Connecticut.


__/s/ CFD_____
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**